T.C. Memo. 2017-220

UNITED STATES TAX COURT

VHC, INC. AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 4756-15, 21583-15.          Filed November 7, 2017.

<u>Robert E. Dallman</u>, <u>Daniel B. Geraghty</u>, <u>Thomas R. Vance</u>, <u>Robert M. Romashko</u>, <u>Christina L. Peterson</u>, <u>Robert J. Janssen</u>, <u>Patrick S. Coffey</u>, and <u>Daniel J. Walsh</u>, for petitioner.

<u>Christa A. Gruber</u>, <u>Lauren N. May</u>, and <u>Danielle R. Dold</u>, for respondent.

CONTENTS

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.   Overview of VHC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
     A.   VHC's Corporate Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
          1.   VOS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
          2.   Best Built . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**[*2]**     3.   Spirit Fabs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
             4.   SCS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
             5.   VDHE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        B.   VHC Ownership and Employees. . . . . . . . . . . . . . . . . . . . . . 9

II.     Background on VHC Business and Growth . . . . . . . . . . . . . . . . . . . 12

III.    Ronald H.'s Related Companies . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        A.   Nonpaper Companies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        B.   Paper Companies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IV.     Petitioner's Advances to Ronald H. and His Related Companies. . . . . . 23
        A.   Petitioner's Initial Advances . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        B.   Petitioner's Guaranties and Bank Loans . . . . . . . . . . . . . . . . . 27
             1.   Associated Bank . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
             2.   Nicolet Bank . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
             3.   Baylake Bank. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
             4.   Johnson Bank. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
             5.   Other Banks. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        C.   Petitioner's Continued Advances . . . . . . . . . . . . . . . . . . . . . . 35
        D.   Documentation of Advances . . . . . . . . . . . . . . . . . . . . . . . . . 38
        E.   Collection Efforts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

V.      SCS Dispute With Jedson Engineering . . . . . . . . . . . . . . . . . . . . . . . 45

VI.     VHC's Purchase of Apartments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

VII.    Petitioner's Tax Returns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

I.      Burden of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

II.     Related-Party Bad Debt Deductions . . . . . . . . . . . . . . . . . . . . . . . . . 51
        A.   Positions of Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
        B.   Bona Fide Debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
             1.   Factors Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

**[*3]**          a.    Name Given to Certificates Evidencing Indebtedness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

b.    Presence or Absence of a Fixed Maturity Date/Failure to Pay on the Due Date . . . . . . . . . . . . . 56

c.    The Source of Payments . . . . . . . . . . . . . . . . . . . . . . . 57

d.    Right To Enforce Payments . . . . . . . . . . . . . . . . . . . . 59

e.    Increased Management Participation . . . . . . . . . . . . 60

f.    Thin Capitalization/Insolvency/Risk Involved in Making the Advances . . . . . . . . . . . . . . . . . . . . . . . 62

g.    Use of Advances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

h.    Success in Obtaining Loans From Outside Lending Institutions . . . . . . . . . . . . . . . . . . . . . . . . . 65

i.    Intent of the Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

j.    Payment or Accrual of Interest . . . . . . . . . . . . . . . . . 70

   2.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

III.    VHC's Alternative Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

   A.    Section 162 Deductions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

   B.    Equitable Recoupment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

   C.    Accrued Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

IV.    Jedson Dispute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

   A.    Accrual of Income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

   B.    Bad Debt Deduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

V.    Interest Expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

[*4]     MEMORANDUM FINDINGS OF FACT AND OPINION

KERRIGAN, Judge:  In these consolidated cases, respondent determined the following deficiencies with respect to petitioner's Federal income tax liabilities for tax years 2004-13 (tax years at issue):

| Year | Deficiency |
|------|-----------|
| 2004 | $2,507,262 |
| 2005 | 1,360,723 |
| 2006 | 1,462,854 |
| 2007 | 929,853 |
| 2008 | 5,393,079 |
| 2009 | 2,607,540 |
| 2010 | 3,437,475 |
| 2011 | 1,941,442 |
| 2012 | 8,593,094 |
| 2013 | 4,259,288 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the tax years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

[*5] The issues for consideration are: (1) whether petitioner is entitled to related-party bad debt deductions under section 166 for tax years 2004 and 2006-13; (2) whether alternatively petitioner is entitled to business expense deductions under section 162 for the tax years at issue; (3) whether alternatively petitioner is entitled to recoup taxes paid for closed tax years on amounts it advanced to related parties; (4) whether alternatively petitioner is entitled to recoup taxes paid for closed tax years related to accrued interest; (5) whether alternatively petitioner is entitled to reduce income by the amount of interest income accrued but unpaid; (6) whether petitioner is entitled to an unrelated-party bad debt deduction under section 166 for tax year 2007; and (7) whether petitioner is entitled to interest expense deductions under section 163 for tax years 2009-13.[1]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate by this reference the stipulation of facts and the attached exhibits.

I.  Overview of VHC

VHC is a Wisconsin corporation with its principal place of business in Green Bay, Wisconsin, when it timely filed its petition. During the tax years at

---

[1]There are two computational issues: the amount of the charitable contribution deduction for 2006 and whether there was a net operating loss for 2006.

[*6] issue VHC was a holding company of five wholly owned subsidiaries (collectively, VHC or petitioner). VHC focused primarily on the paper industry.

During the tax years at issue VHC was a family-controlled company which Raymond Van Den Heuvel founded in 1985. Raymond started in the electrical business with his brothers. In 1982 he branched off and formed his own business, VDH Electric (VDHE). He started VHC in 1985. Raymond remained the president of VHC until he retired in 1992.

Raymond[2] and Patricia are the parents of eight children, including Ronald H., David, Steven, Timothy, and Raymond II. All the sons worked for VHC in different capacities.

A.    VHC's Corporate Structure

During the tax years at issue VHC was a holding company that owned commercial and residential properties and was the sole owner of the following five subsidiaries: VOS Electric, Inc. (VOS), Best Built, Inc. (Best Built), Spirit Fabs, Inc. (Spirit Fabs), Spirit Construction Services, Inc. (SCS), and VDH Electric, Inc. (VDHE). Three of the five presidents of the subsidiaries were either sons of Raymond and Patricia or sons-in-law. Since 1995 one of the SCS directors has been a son of Raymond and Patricia. At the time of trial VHC employed four

_____

[2]Raymond was not living at the time of the trial.

[*7] people directly at its headquarters. VHC offered health insurance through a self-funded plan.

1.    VOS

VOS was incorporated in September 1985 in Wisconsin. VOS operates primarily as a nationwide electrical general contractor, performing electrical hookups for paper machines or other industrial equipment. In March 1986 Ronald H. became president and director of VOS. He served as president until August 2002 when he became senior vice president in charge of sales. Since 2002 Timothy has been the president of VOS, which currently employs approximately 250 people at its headquarters. Ronald H. served as a director of VOS until September 2005 and received wages until December 2009.

2.    Best Built

Best Built was incorporated in August 1992 in Wisconsin. Best Built is a general contractor specializing in commercial and residential construction. Craig Kassner (C. Kassner), who is married to one of Raymond and Patricia's daughters, served as president of Best Built from August 1992 until April 2015.

3.    Spirit Fabs

Spirit Fabs was incorporated in November 1993 in Wisconsin. Spirit Fabs provides structural steel and pipe fabrication services for customers throughout the

**[*8]** United States and has approximately 50-99 employees. In 1995 the following directors were approved: Ronald H., David, and Doug Barone (D. Barone). Ronald H. was removed as a director of Spirit Fabs in 2005. David and D. Barone remained as directors.

4. SCS

SCS operates in industrial construction, primarily serving the paper industry. In 1989 Spirit Industrial Contractors was incorporated in Georgia. In 1991 Spirit Industrial Contractors entered into a joint venture with the Boldt Group, forming Boldt/Spirit, Inc. VHC and the Boldt Group each purchased 100 shares of Boldt/Spirit, Inc., which then purchased the assets of Spirit Industrial Contractors. In 1992 Boldt/Spirit, Inc., changed its name to SCS, and in 1995 VHC bought out the Boldt Group's stake, becoming the sole owner of SCS.

Ronald H. served as president and director of SCS from 1995 until August 2002, at which time he became senior vice president in charge of sales. Steven has been president of SCS since 2002. Ronald H. remained a director of SCS until 2005 and received wages from SCS until December 2009.

[*9]        5.    VDHE

VDHE was incorporated in 1982 in Wisconsin and operates as an electrical contractor, performing mostly residential work.  Ronald Lentz (R. Lentz) is the current president of VDHE, and he has been president since the 1990s.

B.    VHC Ownership and Employees

During the tax years at issue members of the Van Den Heuvel family (VDH family), including relatives by blood and marriage, had a controlling interest in VHC.  In 1998 the following VDH family members collectively owned approximately 75% of the voting stock and 63% of the nonvoting stock of VHC: Ronald H., Steven, Raymond II, David, Guy Piontek (G. Piontek), Timothy, and C. Kassner.  William Bain (W. Bain) was related to the VDH family by marriage until approximately 30 years ago.  In 1998 W. Bain owned approximately 7% of the voting stock and 10% of the nonvoting stock--the same percentage of shares as David, Timothy, and Raymond II.  G. Piontek is married to one of Raymond and Patricia's daughters.

In 1998 Ronald H. owned 600 shares of voting stock and 500 shares of nonvoting stock.  He owned the most voting stock of anyone, including family members.  Ronald H.'s son Ronald A. became a shareholder in 2000, and his son Ryan became a shareholder in 2003.  Ronald A. and Ryan remained shareholders

[*10] through 2013.  Raymond did not own any VHC stock in 1998.  However, Raymond held himself out as a director or treasurer of VHC from 1996 through at least 2010.

From 1998 through 2007 Ronald H.'s stock ownership remained the same.  In 2008 he owned the same total number of shares, but he owned less voting stock, 200 shares instead of 600 shares, and more nonvoting stock, 900 shares instead of 500 shares.  His 200 voting shares were the second most voting shares owned by anyone, including VDH family members.  His 1,100 total shares were tied for the most shares owned by anyone, including VDH family members.  Ronald H.'s 2008 stock ownership remained the same through 2012.  In 2013 Ronald H. owned no voting stock and only 690 shares of nonvoting stock.

After Ronald H.'s voting shares decreased to 200, his brother David became the owner of the most shares of voting stock.  In 2008 David held 1,100 total shares--400 voting and 700 nonvoting.  David's 2008 stock ownership remained the same through 2013.

In 1992 Susan L. Bougie (S. Bougie) was elected VHC's president, succeeding Raymond.  In 1998 David was elected VHC's president and director and remained in those positions at the time of trial.  S. Bougie served as VHC's

[*11] bookkeeper from 1997 through 2001. She never served as a director of VHC or owned any stock in the company.

Nancy Stellpflug (N. Stellpflug) worked as VHC's certified public accountant (C.P.A.) and corporate secretary from 1986 to 2006. She oversaw all the accounting functions at VHC and its subsidiaries and maintained VHC's books and records. From 1999 through 2006 N. Stellpflug owned 3 voting shares and 27 nonvoting shares of VHC Stock.

In 2006 James Kellam (J. Kellam) became VHC's bookkeeper and corporate secretary. He is the son-in-law of S. Bougie. In 2009 J. Kellam became a shareholder and owned a total of 22 shares--2 voting and 20 nonvoting. His stock ownership increased gradually, and in 2013 he owned a total of 110 shares--10 voting and 100 nonvoting. Before working for VHC he worked at a company Ronald H. owned from 1997 until 2006.

Shareholder voting generally took place at semiannual meetings held in April and September of each year. During the tax years at issue VHC held informal meetings on every other Friday with holders of 200 or more shares. Shareholders other than VDH family members who attended these informal meetings included R. Lentz, W. Bain, Jim Rottier (J. Rottier), Jim Thiry (J. Thiry),

**[*12]** and Doug Barrone (D. Barrone).  These informal meetings were generally not recorded.

II.     Background on VHC Business and Growth

When Raymond started VDHE in 1982 it had approximately 12 employees and operated only in Green Bay, Wisconsin.  When Raymond started VHC in 1985 it had about 50 employees.  In 1985 VHC, through VOS, began working on Fort Howard Paper Co.'s (Fort Howard) plant in Rincon, Georgia, and it grew to approximately 600 employees.  The Fort Howard project was the main driver of this growth.  Ronald H. supervised the Fort Howard project for VHC.

After successfully completing the Fort Howard project, VHC began working for major paper companies across the United States.  In 1989 Ronald H., as part of a plan to expand VHC nationally, founded Goss Mechanical to augment VOS' operations.  VHC subsequently purchased Goss Mechanical's assets a year later and started Spirit Industrial Contractors, which became SCS.  SCS then began providing services to some of the largest manufacturing companies in the United States.  SCS grew because of Ronald H. and his personal contacts with leaders within the paper industry.

SCS and VOS were the most successful subsidiaries.  SCS and VOS worked frequently together to provide coordinated mechanical and electrical work on

[*13] various projects. Since the Fort Howard project VHC's numbers of employees and its revenue have grown steadily.

Before 1997 Ronald H. was known to VHC's shareholders as a great salesman whose primary job functions included sales and working on jobsites. VHC credits Ronald H. for the company's expansion from a local company to a national one, in particular because of his success in obtaining work from Fort Howard. He did significant work for VHC within plants owned by Fort Howard, and he brought the skills and knowledge of the paper-making process into VHC's business. He was able to use the Fort Howard experience for VHC's benefit, to make sales and supervise jobs for VHC with other paper companies.

As president of SCS and VOS Ronald H. obtained licenses and managed jobs on site. His duties included being in charge of sales, contracts, and customer relations. Ronald H.'s connections to major paper companies allowed SCS and VOS to either bid on jobs for those companies or be awarded jobs without the bidding process altogether.

During the tax years at issue VHC worked in approximately 20 to 30 States. Ronald H. held 28 licenses for approximately 20 States as a general contractor, HVAC contractor, electrical contractor, pipefitter, and millwright. As of 2002 VHC continued to use Ronald H.'s licenses for work in approximately 20 States.

[*14] VHC continued to use his licenses throughout the tax years at issue, and it still used his Oklahoma license in exchange for providing him health insurance.

III.    Ronald H.'s Related Companies

A.    Nonpaper Companies

In the early 1990s Ronald H. started several businesses outside of VHC, including a bank in Rincon, Georgia, and a plant in Pennsylvania called Clarion Fibre. The Clarion Fibre plant produced wood products, and SCS and VOS were given the contract to build the plant. The contract was profitable for SCS and VOS. Ronald H. also owned RVDH Development Corp., which owned a Lear jet, and Care for All Ages, Inc. (CFAA), which provided child and adult care services. CFAA and RVDH Development Corp. were dissolved in 2009 and 2015, respectively.

Before 1996 VHC's officers knew that Ronald H. had started several ventures outside of VHC. W. Bain, a former brother-in-law and major shareholder of VHC, managed or assisted in managing Ronald H.'s business ventures. He was also a part owner of CFAA.

In 1996 Raymond walked in on Ronald H. and W. Bain in VHC's boardroom having a meeting about their outside ventures. At that time Ronald H. and W. Bain were operating four homes for the elderly together through CFAA,

[*15] and it was taking significant time away from their duties at VHC. On July 19, 1996, VHC notified W. Bain by letter that his conduct was in violation of its amended bylaws and threatened to reduce his salary and convert his voting stock to nonvoting stock. The letter informed W. Bain that if within six months he decided to return to work full time he would return to the same status he had before the notification. W. Bain quit CFAA and went back to work for VHC. Ronald H. did not receive a similar letter from VHC.

In 1998 VHC discovered that Ronald H. had started a company called Patriot Contractors which competed with VHC and its subsidiaries. Ronald H. had previously won a project for VHC with Kimberly-Clark Corp. (Kimberly-Clark), but VHC was losing money from the job. After VHC told Kimberly-Clark that it could not continue to perform the job at the current rates, Patriot Contractors took over the job. In 1998 Patriot Contractors also won a contract from Kimberly-Clark to build a warehouse in Arkansas. The project began to fail and Patriot Contractors did not pay its subcontractors. Kimberly-Clark contacted VHC about the project and informed it that Ronald H. had represented that Patriot Contractors was part of VHC. According to notes of a board of directors meeting held on December 12, 1998, VHC decided to purchase the assets of the company that

[*16] owned the warehouse in Arkansas for $10 million and lease it to Kimberly-Clark.  Raymond and Ronald H. were present at this board of directors meeting.

B.     Paper Companies

At the same time Ronald H. started his nonpaper companies, he began to make plans to enter the paper mill business.  Generally, Ronald's H. companies were involved in the business of making and converting paper into tissue.

In 1997 Ronald H. formed Partners Concepts Development, Inc. (PCDI), in De Pere, Wisconsin.  During the tax years at issue he owned a majority of PCDI shares and managed its business.  He was PCDI's president and chairman.  In 2012 PCDI received a notice of administrative dissolution, but as of June 4, 2014, PCDI was a corporation in good standing with the State of Wisconsin.

J. Kellam was PCDI's vice president and worked for the company from June 1997 through May 2006.  Since at least 1999 Raymond operated as PCDI's chief financial officer (CFO) and held weekly PCDI-related meetings with Ronald H. at VHC's headquarters.

In 1997 Ronald H. asked VHC to invest in PCDI.  VHC did not invest in PCDI because of a potential conflict of interest with VHC's other customers.  At a VHC shareholders' meeting on August 9, 1997, VHC decided that its shareholders could invest in PCDI.  Ronald H. was not present at the meeting.  The

[*17] shareholders decided that Ronald H. could own at least 51% of PDCI, and that other VHC shareholders could purchase less than 5% of PCDI's stock. The minutes from this meeting reported that Ronald H. would continue to procure work for SCS and VOS, but his wages would be cut in half. The minutes also indicated that the officers for SCS and VOS would change, but Ronald H. remained president of these companies until 2002.

In 2000 VHC placed VOS' project manager, J. Rottier, at PCDI's operations and asked him to report back to VHC on his findings. J. Rottier was also a VHC shareholder with 220 total shares, 40 voting and 180 nonvoting. Once at PCDI he worked as the assistant plant manager, and he eventually became the plant manager at the Oconto Falls Tissue, Inc. (OFTI) mill. VOS paid J. Rottier while he was PCDI's plant manager. He worked at the OFTI mill until 2006. He continued to attend VHC board meetings during the time he worked at the OFTI mill.

From 1998 through 2002 VHC shareholders that owned PCDI shares included all of the VDH brothers, as well as W. Bain, G. Piontek, C. Kassner, R. Lentz, N. Stellpflug, and J. Rottier. Raymond also owned shares of PCDI. Most of these shares were canceled in November of 2003. J. Kellam still owns his PCDI shares.

[*18] PCDI owned controlling interests in a number of companies that were involved in different aspects of the paper industry. In 1997 PCDI Oconto Falls Tissue, Inc., was incorporated in Wisconsin and later changed its name to Oconto Falls Tissue, Inc. (OFTI). Ronald H. was the sole director and president of OFTI. J. Kellam served as OFTI's vice president. In 2001 Tissue Products Technology Corp. (TPTC) was incorporated in Wisconsin. After 2001 TPTC, which PCDI controlled at all times, owned 100% of OFTI. TPTC was administratively dissolved by the State of Wisconsin on December 13, 2011, but was restored to good standing in 2014. In 2005 PCDI owned a majority of TPTC shares.

From July 1997 to April 16, 2007, OFTI owned a tissue mill in Oconto Falls, Wisconsin (OFTI mill). Ronald H. purchased the OFTI mill from Kimberly-Clark in 1997. His plan was to install a paper machine that produced 106-inch rolls of tissue, which could then be delivered to customers to cut down to size for use as consumer products. SCS served as a subcontractor on some work for the first installation of the first paper machine at the OFTI mill.

In 1997 Re-Box Paper, Inc. (Re-Box), was incorporated in Wisconsin. It changed its name to Re-Box Packaging, Inc., then back to Re-Box Paper, Inc., and

[*19] then to EcoFibre, Inc. (EcoFibre).[3]  EcoFibre received a notice of administrative dissolution from the State of Wisconsin in January 2012 but was restored to good standing in 2014.  Ronald H. served as president and director of EcoFibre from its inception through at least 2006.

PCDI owned 88% of EcoFibre.  When Ronald H. acquired the EcoFibre facility it operated as a recycled pulp mill that converted recycled waste paper into paper pulp, which could then be used to make other paper products.  Ronald H. intended to convert the EcoFibre facility into a liner-board facility--a paper mill that produced cardboard.  According to a board of directors meeting on December 12, 1998, VHC agreed to purchase the EcoFibre real estate and equipment and then to lease the property to OFTI, with OFTI agreeing to purchase EcoFibre's operations.  Ronald H. was present at this meeting.  VHC purchased the EcoFibre real estate for $6 million.  VHC financed the purchase with a $6 million loan from Associated Bank, which carried a 7% fixed interest rate for three years.  In 1999 VHC sold the EcoFibre facility to Ronald H. through an installment sale.

VHC involved itself with EcoFibre because of the potential to obtain significant construction projects.  VHC believed potential customers included Fort

---

[3]We use the term "EcoFibre" to include operations under previous names.

[*20] Howard, Green Bay Packaging, Inc. (Green Bay Packaging), and Procter & Gamble Corp. (P&G), and that Enron, Inc. (Enron), was a potential investor.

PCDI owned 67% of Custom Tissue, LLC (Custom Tissue), and the remaining portion was owned by employees or other related parties. Custom Tissue was incorporated in Wisconsin in 2003. Custom Tissue owned 49% of Nature's Way Tissue Corp. (NWTC), a Wisconsin corporation that was majority owned by Native American investors. TPTC performed management functions for NWTC under a management agreement. NWTC converted tissue rolls into finished, packaged products. NWTC owned 100% of both Custom Paper Products, Inc. (CPPI), and Purely Cotton Products Corp. (Purely Cotton). CPPI was incorporated in 2000 in Wisconsin. It operated as a converting operation, which took large tissue rolls and cut them into consumer-size rolls. Purely Cotton owned the patents, technology, and intellectual property regarding a process for making tissue out of cotton. Custom Tissue, NWTC, CPPI, and Purely Cotton were administratively dissolved in 2012.

Tissue Technology, LLC (TTL), was incorporated in 2006 in Wisconsin, and serves as a holding company. Ronald H. is one of its members and controls the company. In 2012 TTL received a notice of administrative dissolution, but it was restored to good standing in July 2014.

[*21] In 1998 VHC was losing customers to Ronald H.'s competing companies. VHC lost its work with Green Bay Packaging and Kimberly-Clark, which was potentially worth several hundred millions of dollars. Concerns about Ronald H.'s competing companies were addressed at a February 14, 1998, board of directors meeting. The directors agreed that Ronald H. would pay VHC $200,000 in exchange for continuing to work on his outside ventures without losing his stock or reducing his wages. Ronald H. was present at this meeting.

While Ronald H. began his paper companies and VHC provided work at the OFTI mill and EcoFibre facility, Ronald H. continued to serve as president and director of SCS and VOS. In 2002 he was replaced as president of SCS and VOS, but he remained vice president in charge of sales for both companies. His sales and customer relations role remained the same as when he was president. He remained in this role until December 1, 2009. His electrical licenses were useful to SCS and VOS for obtaining projects.

The minutes of a special meeting of the board of directors of VHC held on December 1, 2009, reported that Ronald H. resigned from his positions at SCS and VOS, but that he could return. He received a Form W-2, Wage and Tax Statement, from VOS covering the period through December 2009. Ronald H.

[*22] was enrolled in VHC's self-funded health plan during the tax years at issue and was enrolled in the plan at the time of trial.

On October 15, 2010, the board of directors of VHC agreed that Ronald H. is a key person and that it would be in VHC's best interest to purchase keyman life insurance on his life. On October 22, 2010, David applied for a life insurance policy with John Hancock, Inc., on Ronald H.'s life, and on the application stated that VHC was Ronald H.'s employer. Attached to the application was a financial supplement stating that Ronald H. received as compensation $175,000 from VHC in 2010 and a total of $350,000 for the two preceding years.

On May 30, 2013, VHC entered into an agreement with Ronald H. to purchase some of his VHC shares that Manchester Mortgage held to secure a loan related to his primary residence. Manchester Mortgage held 1,100 shares. VHC purchased 410 shares of stock at a frozen value from Manchester Mortgage, and Manchester Mortgage agreed to return the remaining 690 shares to VHC. The value of these 690 shares was frozen, but if Ronald H. were to return to VHC or one of its subsidiaries full time, his stock would be unfrozen and going forward would be subject to the same increases or decrease in values determined by the shareholder.

**[*23]** IV.    Petitioner's Advances to Ronald H. and His Related Companies

According to a spreadsheet created by J. Kellam summarizing VHC's advances, VHC advanced $111,149,341 to Ronald H. or his related companies from 1997 to 2013.  This amount included guaranties of Ronald H.'s and his related companies' debts, lines of credit, nonguaranteed advances, and payments to Ronald H.'s and his related companies' creditors.[4]

A.    Petitioner's Initial Advances

According to VHC's spreadsheet it began advancing funds to Ronald H. and his related paper companies when they were first organized in 1997.  VHC began advancing PCDI funds in December 1997.  CPPI was incorporated on June 1, 2000, and on November 2, 2000, VHC advanced $1 million to CPPI.  According to VHC's records from 1997 through 2002 it advanced $45,553,961 to Ronald H. and/or his related companies but received payments of only $17,173,062.

From 1997 through 2002 VHC advanced funds to Ronald H.'s related companies in the belief that his various projects would be lucrative for VHC. Advances were made to assist EcoFibre and to help Ronald H. potentially sell the OFTI mill to United Arab Emirates, Inc. (UAEI).  It advanced funds to finance the

---

[4]VHC treated guaranties entered into, bank debt it absorbed, and payments to other creditors on behalf of Ronald H. and his related companies as advances on its spreadsheet.  As petitioner did, we refer to these transactions as advances.

[*24] installation of a second tissue machine at the OFTI mill, which was intended to make the purchase of the mill more attractive to UAEI. VHC expected UAEI to provide work for VHC. The potential work that VHC could obtain from Ronald H.'s projects would be profitable to VHC because it would not have to negotiate against other bidders and would be able to set the terms of its work.

In 2001 UAEI did not ultimately purchase the mill, and Enron's bankruptcy ended its potential to invest in EcoFibre. Ronald H. was unable to make payments on bank loans or obtain additional paper supplies. Despite these events VHC continued to advance funds to Ronald H.

VHC advanced funds from 1997 through 2002, even though the advances created problems in obtaining surety bonds. Surety bonds are required for contractors working on public contracts and for some private contracts, and they ensure that the work for the project will be completed without bills for the obligee to pay after completion. The millions of dollars of receivables VHC had on its balance sheets attributable to the advances made to Ronald H. and his related companies affected its ability to obtain surety bonds. As VHC continued to advance funds to Ronald H., its ability to obtain bonding decreased. The difficulty in obtaining surety bonds damaged VHC's ability to bid on public work or private contracts that required bonding.

[*25] Advances to Ronald H. and his related companies were discussed at monthly meetings among the principals of VHC. Raymond, who did not own VHC stock in 1998 or throughout the years at issue, attended these meetings. David discussed new advances to Ronald H. and his related companies with VHC's shareholders but did not discuss renewals of advances with the shareholders. According to David, the shareholders did not vote to approve the advances but there was unanimous approval after discussions regarding the advances. Shareholders discussed the advances without being privy to detailed financial information of Ronald H. and/or his related companies. VHC shareholders considered Raymond and David the ultimate decision makers on whether to advance funds to Ronald H. and his related companies.

Although retired from his position as president and director of VHC, Raymond continued to attend VHC directors meetings and sometimes called the meetings to order. Raymond continued to review VHC's financial records. According to the minutes of a meeting called by the VHC directors on March 13, 1999, Raymond explained the profits and losses of the VHC group of companies. At a board of directors meeting in 1999 Raymond offered input as to why SCS was underperforming. In 2003 Raymond as CFO of EcoFibre, PCDI, and TPTC signed a loan modification agreement between Baylake Bank and VHC.

[*26] VHC advanced funds to Ronald H. and his related companies when the companies had more debt than equity on their financial statements. In specific instances VHC advanced funds because of its relationship with certain investors in Ronald H.'s related companies. For example, in 1998 VHC advanced funds to buy out Roy Stumpf, a family friend and businessman. VHC advanced the funds to buy out Roy Stumpf after it learned that Ronald H. had taken out for personal use money that R. Stumpf and his partners had invested in PCDI. In 1999 VHC advanced funds to PCDI to buy out Paul Schierl because he was a "good guy" in the community. In 1999 VHC also advanced funds for Ronald H. to pay his Federal and State income taxes.

From 1997 through 2002 VHC continued to make advances to Ronald H. and his related companies even though the companies were financially unstable. VHC advanced funds with the goal that Ronald H. would eventually be able to manage PCDI and EcoFibre independently. Even with the advances from VHC, PCDI was struggling financially and could not pay its bills.

Beginning in 2000 W. Bain, a VHC shareholder and former brother-in-law, served as a straw borrower for Ronald H. by obtaining loans on behalf of Ronald H. at different banks. In 2000 he obtained a loan for $125,000 from Associated Bank and a loan for $250,000 through Nicolet Bank. In 2002 he used his personal

[*27] credit to obtain a $500,000 loan of which Ronald H. used the proceeds to buy out an EcoFibre shareholder.

In 2004 VHC advanced approximately $120,000 for Ronald H. to pay three years of past-due property taxes on his home. In 2005 VHC advanced funds for Ronald H. to reduce the principal owed on his home by $2 million.

Between 1998 and 2001 VHC began having conversations with Ronald H.'s banks, individual lenders, and investors on the status of his related companies. Local Green Bay bankers called David to discuss their lending activities with the companies and whether there was a real prospect of repayment.

VHC negotiated with banks on behalf of Ronald H. and his related companies and agreed to pay his debts at banks and provide substitute collateral. David met with Associated Bank and told the bank that VHC would purchase a bankrupt steel company that Associated Bank held and that VHC would guarantee Ronald H.'s loans with the bank. In order for VHC to receive a long-term loan from Associated Bank, VHC agreed to guarantee Ronald H.'s and his related companies' debts and to provide as collateral buildings that VHC owned.

B.    Petitioner's Guaranties and Bank Loans

According to VHC's records from 2002 through 2013 it made guaranty payments to banks of $18,667,560, made payments to banks on behalf of

[*28] Ronald H. or his related companies on which VHC assumed the obligation to the banks of $16,050,809, made advances for Ronald H. and his related companies to pay bank debt of $3,224,149, and made advances for Ronald H. and his related companies to pay other creditors of $10,604,959.

### 1.    Associated Bank

Associated Bank provided loans both to VHC and to Ronald H. and his related companies. By late 2001 Associated Bank's strategy was to reduce its overall exposure to Ronald H. and his related companies by shifting as much of his debt as possible to VHC. Before 2002 VHC agreed to guarantee approximately $27 million of Ronald H.'s and/or his related companies' debt to Associated Bank.

In 2002 Associated Bank's combined loan exposure between VHC and Ronald H.'s related companies was approximately $54 million, about $25 million of which was attributable to VHC. At this time VHC contacted Associated Bank to discuss a renewal of its working lines of credit, which was necessary for it to stay in business because it used the lines of credit to make weekly payroll and monthly payables. From 1999 through 2002 VHC's working lines of credit were with Associated Bank and were generally on two-year terms. VHC was concerned that its lines of credit would not be renewed. VHC tried unsuccessfully to obtain

**[*29]** lines of credit from other financial institutions. The agreement that was ultimately reached required VHC to subordinate any and all debts owed to it by PCDI, CPPI, OFTI, or TPTC to Associated Bank.

VHC received a call from Associated Bank's special loan group in Milwaukee, Wisconsin, and was informed that VHC's and Ronald H.'s loans would be grouped together. Associated Bank hired Silverman Consulting to perform a forensic review of its lien and collateral positions related to Ronald H. and his related companies and to evaluate its options with respect to VHC's loan portfolio. The consultant in charge discovered that there were significant problems with Associated Bank's collateral tied to Ronald H.'s related companies' loan portfolio. He discovered that Ronald H. had pledged the same assets as collateral to obtain two different loans, without the knowledge of his lender, effectively avoiding Associated Bank's liens on Ronald H.'s related companies' property. The consultant discovered that Ronald H. had a practice of increasing the goodwill reflected on the companies' balance sheets by selling assets between companies for successively higher values and recording the increases fictionally as goodwill. Associated Bank's special loan officer conveyed a summary of the consultant's findings to VHC.

**[\*30]** After the consultant's review Associated Bank asked VHC to further guarantee Ronald H.'s and his related companies' debt, and on September 30, 2002, VHC agreed because of concerns about its lines of credit with the bank. Also on September 30, 2002, VHC signed a loan extension agreement with Associated Bank, extending various credit lines and loans between VHC and Associated Bank. The 2002 VHC loan extension agreement required Raymond to use his best efforts to cause TPTC to replace a $2,400,000 letter of credit from Associated Bank with a letter of credit from a different financial institution, provide a backup letter of credit, or pledge cash collateral regarding that letter of credit by December 31, 2002.

After 2002 Associated Bank's special loan officer spoke only with David about Ronald H.'s loans. From 2003 to 2013 Associated Bank continuously discussed with David the source of repayment for Ronald H.'s loans, specifically the potential repayment of Ronald H.'s loans through the sale of his several paper companies. Since 2002 Associated Bank has not lent any funds to Ronald H. or his related companies.

2. Nicolet Bank

Nicolet Bank began its lending relationship with VHC in 2001 and with Ronald H.'s related companies around 2001 or 2002. Nicolet Bank discussed

[*31] Ronald H.'s related companies' loans with VHC in or around 2007. The cofounder of Nicolet Bank asked to meet with David and Timothy to discuss guaranteeing some of Ronald H.'s debts. The bank asked VHC to provide a guaranty for Ronald H.'s debts because they were "problem loans"; if VHC did not provide the guaranty, it would prevent the bank from being able to extend credit to borrowers, including VHC. On March 16, 2007, VHC guaranteed $1 million of TTL indebtedness at Nicolet Bank. The agreement required VHC to subordinate any and all debts owed to it by TTL to Nicolet Bank. On August 14, 2009, VHC guaranteed $4,600,000 of TTL indebtedness at Nicolet Bank. This agreement also required VHC to subordinate any and all debts owed to it by TTL to Nicolet Bank.

Nicolet Bank merged with Baylake Bank in 2016. As part of the due diligence process, it discovered that Baylake Bank had an $8 million loan with Ronald H. on its books. Nicolet Bank requested that Baylake Bank write off the loan with Ronald H., which it did, before the merger. There had been no source of repayment or collateral for that loan. In 2008 or 2009 Nicolet Bank also wrote off loans with Ronald H. and his related companies because there was no source of repayment.

**[\*32]**       3.       <u>Baylake Bank</u>

VHC and EcoFibre were coborrowers on a loan, dated September 1, 2000, for $5,500,000 with Irwin Union Bank & Trust. The promissory note to Irwin Union Bank was subsequently assigned to Baylake Bank on March 5, 2003. On that date, EcoFibre, PCDI, TPTC, and VHC executed an agreement that removed VHC as coborrower and made it guarantor of $3,424,550, the remaining balance of the loan. Raymond signed this modification agreement as CFO of EcoFibre, PCDI, and TPTC.

On August 16, 2004, VHC provided Baylake Bank a guaranty of all debts of EcoFibre, PCDI, and TPTC at Baylake Bank. On September 10, 2004, VHC executed a monthly payment guaranty, agreeing to make monthly payments of up to $69,758 on amounts owed by EcoFibre, PCDI, and TPTC at Baylake Bank.

In August 2006 the chief executive officer (CEO) and president of Baylake Bank met with VHC to discuss its lending relationship with Ronald H.'s related companies. Baylake Bank had approximately $13 million of direct exposure to Ronald H. and his related companies. The CEO met with David and Timothy. He also met with other bankers in the Green Bay community together with David and Timothy to discuss Ronald H.'s and his related companies' outstanding loans to the banking institutions, including Nicolet Bank and Johnson Bank. Baylake

[*33] Bank's CEO believed that VHC was the more credible source of repayment for Ronald H.'s debts.

On November 16, 2006, VHC agreed to guarantee the unpaid real estate taxes and special assessments that constituted a lien against EcoFibre, which Baylake Bank had intended to pay pursuant to a re-advancement clause in its mortgage and real estate security agreement for certain real estate owned by EcoFibre. In 2008 VHC restructured a portion of Ronald H.'s debt at Baylake Bank whereby VHC assumed a portion of the indebtedness as a direct loan from Baylake Bank to SCS. Baylake Bank made only one loan to Ronald H. after 2008 in the range of $300,000 to $600,000 with operating companies related to Ronald H. serving as guarantors. The bank viewed that loan as a "problem loan", advanced to protect the bank's collateral position.

### 4. Johnson Bank

Johnson Bank had a lending relationship with Ronald H. and his related companies and VHC since at least 2003. In 2007 or 2008 a member of its loan committee reviewed VHC's financial statements and determined that its loans to Ronald H. and his related companies were uncollectible. Most of VHC's advances were unsecured. Johnson Bank discovered through discussions with VHC that Ronald H. had pledged the same asset to more than one bank.

**[\*34]** Johnson Bank discussed collection activity directed towards Ronald H. and his related companies with David and Timothy. In 2007 or 2008 Johnson Bank foreclosed on a property Ronald H. owned, which VHC purchased ultimately at a sheriff's sale. Johnson Bank's loan committee member was not aware of any other banks making new loans to Ronald H. during his time at the bank in 2007-08, with the exception of Horicon Bank.

5.     Other Banks

F&M Bank, which became Citizens Bank in 2004, did not lend funds to Ronald H. after 2003. On September 10, 2004, VHC agreed to guarantee Ronald H.'s debts at F&M Bank for a total value of up to $2 million. On February 11, 2009, Citizens Bank contacted VHC regarding VHC shares that Ronald H. had pledged in 2000 to secure a mortgage. In a letter addressed to David at VHC, the bank stated that Ronald H. had irrevocably appointed Citizens Bank with the power to transfer his 1,100 VHC shares to Citizens Bank. Citizens Bank's letter requested that VHC update its books to reflect that Citizens Bank was the holder of and owner of Ronald H.'s 1,100 shares as of February 12, 2009, or that VHC pay the full approximately $3 million owed to Citizens Bank by Ronald H. VHC did not comply with Citizen's Bank's demand, and litigation ensued. To resolve the matter Citizens Bank sold its mortgage loan to Manchester Mortgage Co., LLC

[*35] (Manchester Mortgage). On May 30, 2013, VHC agreed to purchase from Ronald H. 410 common shares out of the 1,100 shares that Ronald H. had previously pledged to secure a mortgage for $1,094,290, in order to stop further legal proceedings by Manchester Mortgage.

C.      Petitioner's Continued Advances

While VHC guaranteed Ronald H.'s debts to banking institutions and subordinated any potential repayments from Ronald H. to those institutions, it continued to advance funds to Ronald H. It continued to advance funds in 2003 and 2004 to assist Ronald H. in an effort to sell the OFTI mill to Wausau Paper.

VHC continued to advance funds to Ronald H. and his related companies while the companies had large amounts of debt. In 2004 after Ronald H. failed to sell the OFTI mill, VHC began claiming bad debt deductions on its Federal income tax returns. Even after beginning to claim bad debt deductions in 2004, VHC continued to advance funds. For example, according to its spreadsheet, VHC advanced $1,900,000 to PCDI to buy out PCDI shareholders and $19,065 to pay the City of De Pere, Wisconsin, for outstanding water and sewer payments due for the EcoFibre facility.

VHC became aware of a potential sale of the OFTI mill to ST Paper, LLC (ST Paper), in 2005. ST Paper and Ronald H. and his related companies planned

[*36] to enter into a joint venture to construct three tissue mills at the EcoFibre facility, at the OFTI mill, and in Utah. SCS was expected to work on these projects. The proposal was for Ronald H. to sell ST Paper 50% of his stake in the existing EcoFibre facility and 50% of the permitted six-acre parcel with utility rights on the OFTI mill and to contribute the EcoFibre facility and the OFTI mill as equity for ST Paper's bid to finance the three tissue mills with lending institutions.

The negotiations with ST Paper continued into 2006, with the proposed sale to be executed in phases. Phase 1 was the proposed purchase of the OFTI facility, and phase 2 was the proposed purchase of the EcoFibre facility with the subsequent construction of additional tissue mills. Ronald H. and Sharad Tak, the CEO and chairman of ST Paper, signed a memorandum of understanding agreeing to close the transaction on May 5, 2006, but the transaction did not occur. At VHC's September 9, 2006, shareholders meeting, David provided the shareholders an update on the potential ST Paper sale. According to the minutes of that meeting David reported that the deal would probably close by the end of October 2006. Ronald H. and Raymond attended this meeting. The sale did not take place in 2006.

[*37] On March 5, 2007, VHC held a special meeting of shareholders to address advances made to Ronald H. According to the minutes of the meeting David noted that as of March 5, 2007, Ronald H. and his related companies owed VHC approximately $72 million, including $8.9 million that represented EcoFibre's debts to Associated Bank. He stated that the financing for the sale of the OFTI mill was not complete, but that if the sale occurred only approximately $9 million would come back to VHC. After considering the debt and the likelihood that VHC would be paid back, David estimated the current value of VHC stock was approximately 56% of full value. Ronald H. attended this meeting.

On April 16, 2007, ST Paper purchased the OFTI mill. ST Paper agreed to a purchase price of $86,400,000, consisting of $55,811,000 in cash used to pay closing costs, superior debts, and inventory, and $30,589,000 in subordinated promissory notes (seller notes) payable to OFTI by ST Paper. To finance the purchase, Tak Investments, Inc. (a company managed by Sharad Tak), and PCDI would be coborrowers on a $20 million note, $7 million of which VHC guaranteed in order to provide the private equity capital for ST Paper to use in the acquisition of OFTI. Other financing for the transaction was arranged by Goldman Sachs Credit Partners, L.P. (GSCP).

**[*38]** The seller notes were each subordinated to GSCP. Sharad Tak Investments, LLC (Tak), and Ronald H. executed a business agreement; Tak executed promissory notes. Ronald H.'s company TPTC pledged two side notes. The side notes were payable only if phase 2 of the acquisition occurred. Phase 2, which would have included the building of additional tissue mills and the sale of the EcoFibre facility, did not take place and VHC did not receive any side notes. Nearly all the assets of OFTI were sold to ST Paper, but VHC did not receive any cash from the sale.

D.    Documentation of Advances

VHC recorded the advances to Ronald H. and his related companies as notes receivable in its books and records. J. Kellam, VHC's bookkeeper from 2006 to the present, prepared a spreadsheet which details the advances from 1997-2013 from VHC to Ronald H. and/or his related companies. According to VHC's spreadsheet VHC recorded that from 1997-2013 it advanced $111,149,341 to Ronald H. and/or his related companies and received payments of only $28,570,453. VHC recorded that it had accrued interest income of $20,849,843 and it received interest payments of $10,314,693. The calendar year totals shown on the spreadsheet were derived from VHC's tax workpapers.

[*39] Discrepancies between VHC's spreadsheet and other exhibits in the record include the following. For 2001 VHC's spreadsheet reports two advances of $1 million each--one from SCS to TPTC and the other from VOS to PCDI. The spreadsheet details these advances as funds used to "Pay Other Creditors". Documents in the record do not support the labels of these advances. On July 18, 2001, Ronald H. on behalf of PCDI executed a promissory note to pay an amount not to exceed $1 million to VOS. The note has handwritten markings that describe monetary amounts of $125,000, $225,000, $300,000, and $100,000 next to July 18, 19, and 31 and August 1, 2001, respectively. The note does not include the purpose of the advance or explain the handwritten amounts. The spreadsheet reports that VHC did not receive payments for this advance. The only other supporting documentation of a $1 million advance in 2001 is a promissory note to pay SCS signed by Ronald H. and Raymond on behalf of VHC and including the handwritten statement "paid in full through note renewal". VHC's spreadsheet does not report a $1 million advance in 2001 for which it received payments.

For 2002 VHC's spreadsheet reported that SCS advanced $510,000 to PCDI. A discrepancy exist between a summary sheet J. Kellam prepared reflecting VHC's 2002 transactions and VHC's spreadsheet for 2002: The summary reflects an advance by SCS to PCDI for $644,943, not $510,000.

[*40] For 2005 VHC's spreadsheet reported that it received payments of principal of $5,659,401. In 2005 VHC received six checks issued by Ronald H. or his related companies totaling $1,089,214. There are no other documents to support the $5,659,401 reported as payments received on the spreadsheet.

VHC had in its possession numerous promissory notes which purported to reflect advances to Ronald H. and/or his related companies. Not all the promissory notes were signed by Ronald H. Individuals would sign notes imitating Ronald H.'s signature. Some notes were signed by other individuals, and other notes had Ronald H.'s stamped signature. According to VHC's bookkeeper, from 2006 to the present VHC accepted stamped signatures. According to N. Stellpflug, VHC's C.P.A. and corporate secretary from 1986 to 2006, if VHC was going to advance funds to Ronald H., he had to sign the promissory note before the funds were released and VHC did not take anybody's signature other than Ronald H.'s. Some promissory notes were not signed.

Most of the promissory notes had fixed schedules for repayment, and renewed promissory notes were renewed without VHC's receiving payments of principal or interest. Many of the renewed promissory notes indicated that the original note was paid in full through the execution of a renewal note. Often promissory notes were renewed when maturity dates arose and were consolidated

[*41] routinely into new larger amounts. VHC did not increase interest rates on notes that were renewed. For example, a promissory note dated April 16, 1998, to pay VHC $2 million was signed by Ronald H. with interest set at the rate that Associated Bank charged VHC. This promissory note was renewed six times, without the payment of principal or interest and with the same interest rate, on April 16 of every year from 1999 to 2004. On October 30, 2005, Ronald H. signed a promissory note that consolidated the $2 million note into a $4,592,743 promissory note to pay VHC.

On September 18, 1998, Ronald H., R. Stumpf, and W. Bain signed a promissory note on behalf of PCDI Oconto Falls to pay $3,500,000 toVHC, payable on September 18, 2001, and bearing an interest rate of 15%. This note was renewed on October 1, 2002, for $2,126,466, extending the maturity date to January 15, 2005, and bearing interest at the rate Associated Bank charged VHC plus an additional 1%. The October 1, 2002, renewal note was subsequently consolidated along with other promissory notes into an October 1, 2004, note on behalf of TPTC and OFTI to pay $22,517,254 to VHC.

VHC continued to make advances without receiving principal payments or interest after it began claiming bad debt deductions in 2004. A promissory note on behalf of PCDI dated May 3, 2004, for $600,000 was made payable to SCS with a

[*42] maturity date of May 3, 2005, bearing interest at the rate Associated Bank charged VHC. On and after May 3, 2005, the note was renewed three times without SCS' receiving payments on principal or interest, ultimately extending the maturity date to January 15, 2009.

VHC sometimes borrowed funds to make advances to Ronald H. or his related companies. For example, in 1998 VHC borrowed $2 million from Associated Bank to advance funds to Ronald H. and his wife to pay their Federal and State tax liabilities for tax year 1997 and for other personal debt. The promissory notes from Ronald H. and/or his companies included interest, but that interest was not always above the rates that VHC paid when it borrowed the funds to advance to Ronald H. VHC borrowed $1 million from Bank One to advance to PCDI, and on December 3, 1997, Ronald H. on behalf of PCDI signed a promissory for $1 million payable to VOS with an interest rate equal to the rate Bank One charged VHC. VOS borrowed $90,000 from Associated Bank to advance to RVDH Development, and on November 5, 2000, Ronald H. on behalf of RVDH Development executed a promissory note for $90,000 with interest at the rate charged by Associated Bank to VOS.

According to VHC's spreadsheet, it received interest payments. VHC had in its possession the following checks from Ronald H. or his related companies:

**[*43]**

| Date | Amount |
|------|--------|
| Aug. 29, 2002 | $160,000 |
| Sept. 3, 2002 | 170,197 |
| Dec. 30, 2002 | 170,279 |
| Jan. 17, 2005 | 354,147 |
| Feb. 4, 2005 | 155,067 |
| Feb. 8, 2005 | 200,000 |
| Feb. 9, 2005 | 280,000 |
| Sept. 16, 2005 | 50,000 |
| Sept. 19, 2005 | 50,000 |
| Feb. 3, 2006 | 69,758 |
| Feb. 3, 2006 | 40,000 |
| Mar. 3, 2006 | 69,758 |
| Mar. 3, 2006 | 40,000 |

The August 29 and September 3, 2002, checks did not specify whether the amounts represented payment for interest, principal, or services or whether they were delivered timely in accordance with schedules of repayment.  The December 30, 2002, check included a notation that $279 of the $179,279 represented interest but did not describe what the remaining amount represented.  The January 17 and February 4, 2005, checks do not state what the amounts represented.  The February 8 and 9 and the September 16 and 19, 2005, checks included notations that the amounts represented loan payments but did not specify whether the

[*44] payments represented principal or interest or for which advances the repayments were intended.

The two checks dated February 3, 2006, and the two checks dated March 3, 2006, did specify the purpose. Petitioner's deposit summary indicates that the payments represented principal but does not explain on which advances the principal was paid.

For 2002 VHC produced three checks from Ronald H.'s related companies totaling $500,476. For 2002 VHC's spreadsheet reported it received interest payments of $1,549,751. For 2005 VHC produced six checks from the companies totaling $1,089,214. Its spreadsheet reported that it received interest payments of $1,378,709. For 2006 VHC had four checks totaling $219,516 from the companies, but its spreadsheet reported that it received interest payments of $410,547.

E.   Collection Efforts

From 2002 to 2004 VHC held daily meetings with Ronald H. at VHC's offices, but with one exception it never formally wrote him requesting repayment for the outstanding advances. VHC sent Ronald H. one demand letter at the beginning of 2002 when he and his wife were in the process of a divorce. On January 14, 2002, VHC's lawyer sent Ronald H. and his wife separate demand

[*45] letters to inform them that VHC was attempting to a collect a debt on personal loans made to Ronald H. The letter specified that on April 15, 1998, Ronald H. and his wife borrowed $2 million from VHC to pay Federal and State tax liabilities for tax year 1997 and other personal debt. The letter further explained that in order to provide Ronald H. and his wife the money, VHC had obtained a $2 million loan from Associated Bank, which was due and owing as of January 14, 2002. VHC did not seek collection or pursue litigation or force foreclosure.

In 2008 VHC stopped accruing interest income and paying tax on it. VHC did not pursue other avenues of collection. It failed to collect through liquidating Ronald H.'s VHC shares or to demand repayment when the OFTI mill was eventually sold in 2007. Because VHC had subordinated any rights to repayments to third-party creditors, it was unable to enforce repayment.

## V.    SCS Dispute With Jedson Engineering

In August 2005 SCS entered into an agreement with P&G to build, install, and commission for operation a paper-making machine for P&G (Wildfire project). Jedson Engineering (Jedson) and Pine Ridge are engineering firms that provide professional design and engineering services for the construction of paper-making machines.

[*46] In August 2005 SCS and Pine Ridge entered into a written agreement under which Pine Ridge agreed to perform engineering services required or requested by SCS on the Wildfire project. Pursuant to SCS' approval Pine Ridge entered into a written agreement with Jedson on October 17, 2005, whereby Jedson agreed to provide engineering services for the Wildfire project.

In February 2007 SCS and P&G entered into a written change order related to the Wildfire project, wherein P&G requested that SCS perform additional startup engineering support services. On the basis of this change order, SCS entered into an agreement with Jedson whereby Jedson agreed to provide certain startup engineering services related to the Wildfire project.

SCS believed that Jedson's failure to meet or perform its responsibilities and duties throughout the Wildfire project resulted in significant cost overruns to SCS. SCS incurred costs to complete the startup and engineering services. On November 16, 2006, SCS issued an invoice for a back charge to Jedson for $203,036, and on September 5, 2007, SCS issued a second invoice and notice of back charge to Jedson of $889,453. SCS' total charges issued to Jedson were $1,092,489.

Jedson did not pay the invoiced amounts and sued SCS in 2007. On April 10, 2008, SCS filed a counterclaim and third-party complaint against Jedson and

[*47] Pine Ridge alleging that SCS had suffered damages in relation to Jedson's performance on the Wildfire project. On March 23, 2011, SCS and Jedson settled the case, and SCS agreed to pay Jedson $280,000 by March 25, 2011, in exchange for the release of its suit against Jedson and Jedson's release of its suit against SCS.

VI.    VHC's Purchase of Apartments

On November 26, 1997, VHC offered to purchase Raymond and Patricia's 65% interest in a 36-unit apartment building in Green Bay. The net purchase offer totaled $750,000. The offer was accepted.

On December 1, 1997, VHC executed a promissory note for $750,000, promising to pay Raymond and/or Patricia the principal sum, with interest on the unpaid principal balance from the date of the note, until paid, at a 10% rate. S. Bougie, president, and N. Stellpflug, secretary, signed the note. Interest was to be paid monthly, commencing on January 10, 1998, with the full principal sum due on December 1, 2002. This promissory note was secured by the 36-unit apartment building.

VHC executed a renewal of the December 1, 1997, promissory note on December 1, 2002, November 15, 2005, and November 15, 2010, ultimately extending the maturity date to November 15, 2015. VHC made no principal

[*48] payments before execution of the renewal promissory notes. On December 4, 2012, VHC paid the renewed promissory note in full.

VII. Petitioner's Tax Returns

Petitioner is an accrual method taxpayer and filed consolidated Federal income tax returns for the tax years at issue. It timely filed its 2004-13 Forms 1120, U.S. Corporation Income Tax Return.

Petitioner retained Schenk SC (Schenk), a professional accounting firm, for the preparation of its yearly consolidated tax returns. Schenk reviewed petitioner's financial statements yearly but did not perform audits. Schenk's review entailed assembling petitioner's work papers, analysis of annual sales and costs of goods sold, and calculations of gross profit margins. Schenk did not express an opinion with regard to petitioner's financial statements and did not perform valuations of the underlying assets of Ronald H.'s companies. Petitioner did not provide Schenk with formal valuations of Ronald H.'s related companies or assets.

For the tax years at issue petitioner claimed deductions on its Forms 1120 for partially worthless bad debts that it asserts were owed to it by Ronald H. and/or his related companies as follows:

**[*49]**

| Year | Partially worthless bad debt deduction |
|---|---|
| 2004 | $5,889,650 |
| 2005 | -0- |
| 2006 | 10,039,574 |
| 2007 | 1,642,373 |
| 2008 | 15,448,547 |
| 2009 | 7,562,648 |
| 2010 | 10,175,075 |
| 2011 | 29,182,217 |
| 2012 | 1,229,017 |
| 2013 | 10,907,594 |
| Total | 92,076,695 |

For tax year 2007 petitioner claimed a bad debt deduction of the $1,092,489 that it asserts was owed to it by Jedson. For tax years 2009-12 petitioner claimed interest expense deductions of $75,000, $75,000, $75,000, and $69,000, respectively, arising from its purchase of Raymond and Patricia's 36-unit apartment building in Green Bay. For tax years 1999-2013 petitioner reported taxable interest income.

**[*50]**                               OPINION

I.      Burden of Proof

Generally, the taxpayer has the burden of proving that the determinations in the notice of deficiency are incorrect.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  As an exception Rule 142(a)(1) provides that the burden of proof lies with the Commissioner "in respect of any new matter, increases in deficiency, and affirmative defenses pleaded in the answer".  Petitioner contends that the burden of proof should lie with respondent with regard to any requirement to substantiate the underlying amounts associated with the related party bad debt deductions because it represents a new matter.  Substantiation of the amounts related to petitioner's claimed related-party bad debt deductions does not represent a new matter because it neither alters the original deficiency nor requires the presentation of different evidence.  See Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989).  Deductions are a matter of legislative grace, and a taxpayer must prove its entitlement to deductions.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84  (1991); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  To that end a taxpayer is required to substantiate each claimed deduction by maintaining records sufficient to establish the amount of the deduction and to enable the Commissioner to determine the correct tax liability.

**[*51]** Sec. 6001; Higbee v. Commissioner, 116 T.C. 438, 440 (2001); sec. 1.6001-1(a), Income Tax Regs.

II.     Related-Party Bad Debt Deductions

Section 166(a) provides as a general rule that a deduction shall be allowed for "any debt which becomes worthless within the taxable year." Section 166 distinguishes bad debts from nonbusiness bad debts. Sec. 166(d); sec. 1.166-5(b), Income Tax Regs. Business bad debts may be deducted against ordinary income whether wholly or partially worthless during the year (to the extent of the amount that becomes worthless). Sec. 1.166-3, Income Tax Regs. A nonbusiness bad debt may be deducted, but only when it becomes completely worthless in the year for which it is claimed, and then only as a short-term capital loss. Sec. 166(d). Section 166 limits the deduction for bad debt losses to the amounts actually paid by a guarantor regardless of the guarantor's method of accounting.

A.     Positions of Parties

Petitioner contends that it is entitled to business bad debt deductions for the tax years at issue for the advances to or for the benefit of Ronald H. and/or his related companies that became partially worthless during the years at issue. Respondent contends that petitioner has failed to establish that claimed advances were debt in substance. Respondent further contends that petitioner's motivation

[*52] for advancing the funds appears to have been to provide capital injections or gifts to assist in forming new companies associated with Ronald H., to provide disguised dividends for the use of Ronald H.'s licenses, or to provide compensation for work contracts Ronald H.'s related companies sent to VHC, for services Ronald H. provided to VHC, or for allegedly exchanging Ronald H.'s VHC voting shares into nonvoting shares.

B.    Bona Fide Debt

There is no bad debt deduction without bona fide debt.  See sec. 1.166-1(c), Income Tax Regs.  The regulations define a bona fide debt as one "which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money."  Id.  A gift or contribution to capital is not considered to create a debt for purposes of section 166.  Kean v. Commissioner, 91 T.C. 575, 594 (1988); sec. 1.166-1(c), Income Tax Regs.  We determine whether a purported debt is in substance and fact a debt for tax purposes from the facts and circumstances of each case, with the taxpayer bearing the burden of proof.  Arlington Park Jockey Club, Inc. v. Sauber, 262 F.2d 902, 905 (7th Cir. 1959); Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980).

Intrafamily transactions, such as those in this case, are subject to rigid scrutiny and are particularly susceptible to a finding that a transfer was intended as

**[\*53]** a gift rather than a debt. See Estate of Van Anda v. Commissioner, 12 T.C. 1158, 1162 (1949), aff'd per curiam, 192 F.2d 391 (2d Cir. 1951). This presumption may be rebutted by an affirmative showing that there existed at the time a real expectation of repayment and intent to enforce the collection of indebtedness. Id.

The advances to Ronald H. and his related companies began in 1997 and continued until 2013. Petitioner began claiming related-party bad debt deductions in 2004. We must first determine whether the advances represented bona fide debt. For a bona fide debt to exist the parties to a transaction must have had an actual, good-faith intent to establish a debtor-creditor relationship at the time the funds were advanced. Beaver v. Commissioner, 55 T.C. 85, 91 (1970). An intent to establish a debtor-creditor relationship exists if the debtor intends to repay the loan and the creditor intends to enforce repayment. Id.; Fisher v. Commissioner, 54 T.C. 905, 909-910 (1970).

Objective factors are considered to determine the parties' intent and whether a bona fide loan occurred, and no single factor is dispositive. See Frierdich v. Commissioner, 925 F.2d 180, 182 (7th Cir. 1991), aff'g T.C. Memo. 1989-393. Factors we ordinarily consider in our analysis include, but are not limited to: (1) the name given to the certificates evidencing the indebtedness, (2) the presence or

**[*54]** absence of a fixed maturity date, (3) the source of payments, (4) the right to enforce repayment, (5) participation in management as a result of the advances, (6) the status of the advances in relation to debts owed to regular corporate creditors, (7) thin or adequate capitalization, (8) the risk involved in making the advances, (9) the identity of interest between creditor and shareholder, (10) the use to which the advances were put, (11) the ability to obtain loans from outside lending institutions, (12) failure to repay advances on the due date, (13) the intent of the parties, and (14) the payment and accrual of interest. Dixie Dairies Corp. v. Commissioner, 74 T.C. at 493; see also Am. Offshore, Inc. v. Commissioner, 97 T.C. 579, 602-606 (1991); Goldstein v. Commissioner, T.C. Memo. 1980-273. Factors which are relevant to the facts in these cases are discussed.

        1.     Factors Analysis

            a.     Name Given to Certificates Evidencing Indebtedness

The issuance of promissory notes may suggest that advances are debt. See Estate of Mixon v. United States, 464 F.2d 394, 403 (5th Cir. 1972). VHC produced promissory notes dating from April 1998 through December 31, 2013, for most of the advances. Formal documentation, however, is not controlling. Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 288 (1990); Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. 367, 376-377 (1973). A genuine debtor-creditor

[*55] relationship must be accompanied by "more than the existence of corporate paper encrusted with the appropriate nomenclature captions." Tyler v. Tomlinson, 414 F.2d 844, 850 (5th Cir. 1969).

Not all the promissory notes that VHC produced were signed by Ronald H. Some were signed by other individuals, and some had Ronald H.'s stamped signatures. J. Kellam, a PCDI employee from June 1997 until May 2006, testified that individuals would sign notes imitating Ronald H.'s signature. N. Stellpflug, VHC's C.P.A. and corporate secretary from 1986 to 2006, testified that VHC would not accept signatures other than Ronald H.'s.

We recognize that many of VHC's advances were supported by promissory notes. Family members are free to document a transaction among themselves in any manner they choose. Therefore, the form selected has little probative force. See Shaw v. Commissioner, T.C. Memo. 2013-170, at *13, aff'd, 623 F. App'x 467 (9th Cir. 2015). Petitioner, a family controlled corporation, was free to document the advances in any manner it chose with Ronald H. and his related companies. Petitioner's promissory notes have little probative force.

Petitioner recorded the advances on its books as accounts receivable and contends that Ronald H. and his related companies recorded them as accounts payable. Ronald H.'s records are not part of the record. The promissory notes and

**[\*56]** bookkeeping entries should be given little weight unless supported by some other objective evidence showing the advances to be loans, especially on account of the familial relationship. See Dixie Dairies Corp. v Commissioner, 74 T.C. at 495; see also Alterman Foods, Inc. v. United States, 505 F.2d 873, 879 (5th Cir. 1974) ("[A]llegedly objective economic indicia of debt such as consistent bookkeeping and consistent financial reporting on balance sheets are * * * little more than additional declarations of intent, without any * * * objective economic indicia of debt."). Petitioner has not introduced objective evidence establishing the advances as loans.

           b.      Presence or Absence of a Fixed Maturity Date/Failure to Pay on the Due Date

The presence of a fixed maturity date may indicate a fixed obligation to repay, a characteristic synonymous with debt. See Estate of Mixon, 464 F.2d at 404. The presence of a fixed maturity date on promissory notes, however, does not preclude a finding that the parties failed to create a genuine indebtedness. See Arlington Park Jockey Club, 262 F.2d at 906.

Many of the promissory notes have fixed maturity dates, but VHC's actions suggested that the maturity dates were meaningless. VHC routinely renewed advances without receiving payments of principal or interest. Many of the

**[*57]** promissory notes included notations that the original promissory note was "paid in full" by a renewal promissory note without supporting evidence as to whether VHC received principal or interest. Promissory notes were renewed when maturity dates arose and consolidated into new notes with greater amounts.

VHC continued to renew advances after it began claiming bad debt deductions in 2004. For example, on May 3, 2004, SCS advanced $600,000 to PCDI, which was evidenced by a promissory note payable on May 3, 2005, and bearing interest at the rate Associated Bank charged VHC. On and after May 3, 2005, the note was renewed three times without VHC's receiving payments on principal, ultimately extending the maturity date to January 15, 2009. VHC routinely executed renewals without the receipt of payment on principal or interest. The fixed maturity dates for the most part were meaningless.

c.     <u>The Source of Payments</u>

A bona fide debt cannot exist for purposes of section 166 where the obligation to repay the debt is subject to a contingency that has not occurred. <u>Zimmerman v. United States</u>, 318 F.2d 611, 612 (9th Cir. 1963); <u>see also</u> <u>Frierdich v. Commissioner</u>, 925 F.2d at 185 (finding that the repayment of advances must be unconditional and cannot be contingent on some future event).

[*58] The sources of Ronald H.'s and his related companies' repayments were contingent on several events that had not occurred at the time VHC made the advances. VHC, in part, made advances to Ronald H.'s companies because of Ronald H.'s personal history of success. VHC generally credited Ronald H. with the expansion of VHC's business from a local company to a national one and believed that his companies would be successful.

Repayment hinged on Ronald H.'s potential closings, expansion plans, and receipt of funds from additional investors. From 1997 to 2001 VHC advanced funds to help Ronald H. potentially sell the OFTI mill to UAEI. At the same time VHC advanced funds to assist Ronald H. in obtaining financing for EcoFibre. VHC contends that potential institutional investors, such as Enron, made Ronald H.'s projects attractive. Part of VHC's motivation to advance funds was the potential of lucrative projects for SCS and VOS.

The UAEI deal collapsed in 2001 and Enron declared bankruptcy, forcing Ronald H. and his companies to seek new sources of financing. Ronald H. never obtained alternative sources of financing. Despite these major setbacks VHC continued to advance funds. It contends that it believed it would recover additional money through anticipated profits from the sale of the OFTI mill and from future work related to the expansion of the OFTI mill and the EcoFibre

[*59] facilities. It continued to advance funds in 2003 and 2004 to assist Ronald H. in selling the OFTI mill to Wausau Paper, but that deal never closed. In 2005 VHC became aware of a potential buyer of the OFTI mill, ST Paper, and continued to advance funds to Ronald H. to help him get to the closing. In 2007 when Ronald H. finally sold the OFTI mill, VHC did not receive cash or any other form of repayment.

VHC could be repaid only through the financial well-being of Ronald H.'s companies. A taxpayer willing to condition repayment of an advance on the financial well-being of the receiving company does not act "as a creditor expecting to be repaid regardless of the company's success or failure." Calumet Indus., Inc. v. Commissioner, 95 T.C. at 287-288 (quoting In re Larson, 862 F.2d 112, 117 (7th Cir. 1988)). If repayment does not depend upon earnings, the transaction has the indication of being a loan to the corporation. Estate of Mixon, 464 F.2d at 405; Am. Offshore, Inc. v. Commissioner, 97 T.C. at 602. In this case payment depended on the success of Ronald H.'s companies or a future event occurring such as the sale of the OFTI mill to UAEI.

### d. Right To Enforce Payments

A taxpayer's right to enforce repayment of an advance suggests that the advances were loans. See Estate of Mixon, 464 F.2d at 405. There is no evidence

[*60] that VHC had any right to enforce repayment of the claimed advances. Whether an advance is subordinate to obligations of other creditors bears on whether the taxpayer advancing the funds acted as a creditor. See id. at 406. VHC subordinated its rights to repayment under the promissory notes with Ronald H. and his related companies to those of banks and other creditors starting in the early 2000s.

### e. Increased Management Participation

The right of the entity advancing funds to participate in the management of a business demonstrates that the advance may not have been bona fide debt. Am. Offshore, Inc. v. Commissioner, 97 T.C. at 603. Although VHC was not a shareholder in Ronald H.'s related companies, it was inextricably linked to them. At a VHC shareholders meeting on August 9, 1997, VHC determined that its shareholders could invest in PCDI. According to the minutes of that meeting, VHC shareholders interested in investing in PCDI could purchase less than 5% of the company. From 1998 through 2002 VHC shareholders that owned PCDI shares included Raymond and all of the VDH brothers, as well as W. Bain, G. Piontek, C. Kassner, R. Lentz, and N. Stellpflug. David owned stock in PCDI while he was president of VHC.

**[*61]** VHC participated in the management of Ronald H.'s outside ventures. Raymond, although he retired from VHC as president and director in 1992, continued to attend VHC shareholders meetings and to review VHC's financial records. He was present at meetings in which advances to Ronald H. were approved. Raymond did not own VHC stock during the tax years at issue, yet he attended and voted at VHC shareholders and directors meetings. At the same time that Raymond influenced VHC, he served as PCDI's CFO. He signed promissory notes between VHC and PCDI as PCDI's CFO and maintained an office at VHC where he held weekly meetings with Ronald H. related to PCDI's business. Raymond's immediate successor at VHC, S. Bougie, VHC's bookkeeper, never was a VHC shareholder or director. Raymond played a major role in VHC and PCDI at the same time.

After Ronald H. started the OFTI mill, VHC placed its employees, including J. Rottier, VOS' project manager and a major VHC shareholder, at the mill for the purpose of knowing the activities taking place at the mill and assessing additional needs of the mill. He worked as the assistant plant manager and eventually became the plant manger of the mill. He worked at OFTI until 2006, and his paychecks always came from VOS.

**[\*62]** VHC and Ronald H. and his related companies were intertwined. Not only did VHC shareholders also own shares in Ronald H.'s companies, but some VHC employees worked for both companies over the years. Throughout the years at issue Raymond and David negotiated with banks on Ronald H.'s behalf, agreeing to pay his debts at other banks and even providing substitute collateral. VHC influenced the management of Ronald H.'s companies.

> f. <u>Thin Capitalization/Insolvency/Risk Involved in Making the Advances</u>

Thin capitalization--a high ratio of debt to equity--may suggest that an advance is not a loan. <u>Estate of Mixon</u>, 464 F.2d at 408. The purpose of examining the debt-to-equity ratio in characterizing an advance is to determine whether a corporation is so thinly capitalized that it would be unable to repay an advance. <u>CMA Consol., Inc. & Subs. v. Commissioner</u>, T.C. Memo. 2005-16.

By 1999 PCDI and its affiliates were operationally in trouble. Advances made by VHC did not remedy Ronald H.'s problems, as PCDI continued to struggle and in 2001 could not pay its bills. Timothy testified that if VHC had not guaranteed Ronald H.'s and his related companies' debts in 2002, the companies would have gone into bankruptcy. VHC continued to make advances to Ronald H.

[*63] and his related companies throughout the years at issue knowing that they would not be repaid.

Ronald H. and his related companies were insolvent from as early as 1999. Petitioner did not provide evidence establishing that Ronald H.'s related companies ever became profitable. Despite the vast sums that Ronald H. and his related companies owed third-party creditors, VHC continued to advance funds knowing that there were no reasonable prospects of repayment. It disregarded clear signs that Ronald H. and his related companies were financially unstable and even negotiated on behalf of him and his related companies at banking institutions.

Petitioner contends that amounts lent to an insolvent investor should be treated as bona fide debt. While amounts advanced to an insolvent debtor alone may constitute debt, advances made to an insolvent or unprofitable debtor where there is no reasonable prospect of repayment are not debts for tax purposes. See Dixie Dairies Corp. v. Commissioner, 74 T.C. at 497. Petitioner made advances without reasonable expectation of repayment throughout the years at issue.

A related consideration includes the risk involved in making the advances. The risks that VHC would not be repaid were substantial. Its routine renewal of promissory notes without the receipt of principal or interest, as well as its paying

[*64] for Ronald H. and his related companies to stay financially afloat, establishes that it knew repayment on its advances was speculative. While the repayment of advances depends in part on the financial success of the receiver of the advances, the risks involved in this case were more speculative than what a third-party creditor would deem acceptable. See Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968). A third-party creditor would not have made these advances. The amounts advanced to Ronald H.'s insolvent or unprofitable related companies cannot be characterized as bona fide debt.

### g. Use of Advances

The use of advances to finance initial business operations when repayment of the advances is contingent on future events suggests the advances are not debt. See id. at 698. VHC extended many of its advances when Ronald H.'s related companies were first organized, suggesting that the advances represented funds to meet initial operating expenses. PCDI was incorporated on June 6, 1997, and by December 3, 1997, VHC had advanced $1 million to PCDI. CPPI was incorporated on June 1, 2000, and on November 2, 2000, it received a $1 million advance from VHC. According to VHC's records from 1997 through 2000, it advanced approximately $25 million to Ronald H. and his related companies.

**[*65]** VHC contends that it made advances to help Ronald H. obtain financing for the EcoFibre project and to sell the OFTI mill. VHC advanced funds to allow Ronald H. to pay overdue water bills to the City of De Pere. VHC even advanced funds to Ronald H. personally to pay his Federal and State income taxes.

VHC advanced funds knowing that Ronald H. and his related companies were unable to repay. Advancing funds to meet initial operating expenses is akin to making a capital contribution. See Slappey Drive Indus. Park v. United States, 561 F.2d 572, 583 (5th Cir. 1977). The use of advances does not support a conclusion that the advances were loans.

### h. Success in Obtaining Loans From Outside Lending Institutions

"[T]he touchstone of economic reality is whether an outside lender would have made the payments in the same form and on the same terms." Segel v. Commissioner, 89 T.C. 816, 828 (1987) (citing Sciptomatic, Inc. v. United States, 555 F.2d 364, 367 (3d Cir. 1977)); see also Calumet Indus., Inc. v. Commissioner, 95 T.C. at 287. A corporation's success in borrowing funds from outside sources may give the transactions at issue the appearance of bona fide indebtedness and may indicate that the advances were made in a manner similar to those that would be extended by reasonable creditors. See Estate of Mixon, 464 F.2d at 410.

**[*66]** From as early as 2000 the record establishes that Ronald H. could not obtain loans from some outside lending institutions. Starting in 2000 W. Bain served as a straw borrower for Ronald H. because he was unable to obtain loans himself. Between 1998 and 2001 VHC began having conversations with Ronald H.'s banks, individual lenders, and investors on the status of his companies and whether there was a real prospect of repayment.

VHC continued to advance funds to Ronald H. and his related companies despite knowing that by 2000 banking institutions and other third-party creditors were no longer lending to him and the companies. VHC recorded on its spreadsheet that from 2000 through 2013 it continued making substantial advances to Ronald H. and his related companies. The financial institutions that made loans to Ronald H. sought guaranties from VHC whereas VHC had no guaranties, collateral, or recourse for failure to repay. This factor suggests that the advances were not debt.

### i. Intent of the Parties

No single factor is determinative, and we must decide whether there "[w]as * * * a genuine intention to create a debt, with a reasonable expectation of repayment, and * * * [whether] that intention comport[ed] with the economic reality of creating a debtor-creditor relationship". Litton Bus. Sys., Inc. v.

[*67] Commissioner, 61 T.C. at 377. Petitioner contends that the funds advanced to Ronald H. and his related companies were at all times intended to be loans. Respondent contends that contemporaneous documents indicate that petitioner's advances were not loans and that instead petitioner infused capital, invested, or distributed funds to Ronald H.

The objective facts in the record establish that VHC did not intend to create a debt between itself and Ronald H. and/or his related companies. VHC's actions reflect that there was not a true debtor-creditor relationship. The advances were made over a long period. The economic circumstances of later years must be considered when analyzing the character of advances in earlier years. See Alterman Foods, Inc. v. United States, 611 F.2d 866, 872 (Ct. Cl. 1979). Ronald H. and his related companies routinely failed to comply with the terms of the promissory notes and VHC failed to enforce the terms, indicating that it did not intend that the advances be loans.

By the mid to late 1990s, the millions of dollars of receivables VHC had on its balance sheets attributable to advances made to Ronald H. and his related companies affected its ability to obtain surety bonds. This reduction in surety bonds limited VHC's revenue, yet it continued to advance funds. VHC lost work

[*68] because of Ronald H.'s companies' competing with its customers, yet it continued to advance funds.

Other objective facts establish that the parties did not intend to enter into a debtor-creditor relationship. VHC advanced funds for payments that were without any business purpose, including covering Ronald H.'s Federal and State income tax liabilities, reducing the principal owed on his home, and paying past-due property taxes on his home. The promissory notes did not specify the purposes of the advances. Petitioner's spreadsheet included some descriptions of the purposes of the advances, but a number of discrepancies exist between the spreadsheet and other parts of the record.

Even if VHC might have intended to create bona fide debt, economic circumstances at the time it made the advances suggest that VHC did not have a reasonable expectation of repayment. As explained above, VHC made advances and continued to advance funds even though it knew Ronald H. could not repay them.

VHC and Ronald H. and his related companies were interrelated. Ronald H. remained involved with VHC even after he began his own companies. There was no clear dividing line for the roles of Ronald H. and Raymond. VHC contends

[*69] that Ronald H. was no longer involved with it, but he was a presence at VHC and continued to receive benefits from it throughout the tax years at issue.

Ronald H.'s actions establish that he never intended to create a debtor-creditor relationship with VHC. In 1998 one of Ronald H.'s companies, Patriot Contractors, held itself out as part of VHC. Patriot Contractors failed to properly complete a contract, and VHC rescued it. Ronald H.'s related companies' competition for some of VHC's customers eventually caused problems for VHC. Ronald H. leaned on VHC to support his companies. VHC was well aware of Ronald H.'s business practices and had rescued Ronald H. and his related companies in the past. There was no reason to believe that he would not require assistance again.

VHC contends that Ronald H. or his related companies paid back some of its advances and that therefore its expectation of repayment was reasonable. Repayment was speculative, but VHC still continued to make advances. The outstanding balance of funds it advanced constantly increased without any guaranty of repayment. These economic circumstances establish that Ronald H. never intended to create a debtor-creditor relationship with VHC.

**[*70]**          j.          Payment or Accrual of Interest

According to its spreadsheet for the tax years at issue, VHC reported receiving interest payments of $10,314,694 and interest income of $20,849,843 from 1997 through 2013.  VHC provided checks from 2002, 2005, and 2006 as support for the underlying amount of interest payments it reported receiving.  For 2002 petitioner offered three checks from Ronald H.'s related companies totaling $500,476, yet for 2002 VHC's spreadsheet states that it received interest payments of $1,549,751.  For 2005 VHC offered six checks totaling $1,089,214, but its spreadsheet indicates that it received interest payments of $1,378,709.  For 2006 it provided four checks totaling $219,516, but its spreadsheet shows that it received interest payments of $410,547.  There is no evidence that interest was paid regularly and consistently.  VHC accrued interest only until 2007 because after that it did not have a reasonable expectation of being repaid.  This factor suggests that the advances were not debt.

          2.          Conclusion

After consideration of the circumstances of VHC's advances to or for the benefit of Ronald H. and/or his related companies, and in the light of the factors set forth above, we conclude that the advances did not represent bona fide debt. VHC did not intend to create a bona fide debtor-creditor relationship, and the

[*71] economic circumstances that existed during the time VHC made its advances establish that it did not reasonably expect repayment. VHC is not entitled to related-party bad debt deductions for the advances it made to Ronald H. and his related companies during the tax years at issue. Because we conclude that the advances do not constitute bona fide debt, we need not address whether VHC established that the advances became partially worthless during the tax years at issue.

III.  VHC's Alternative Arguments

Because we conclude that VHC's advances do not constitute bona fide debt, we address its alternative arguments.

A.  Section 162 Deductions

VHC contends that if the advances did not represent bona fide debt, then, alternatively, it is entitled to business expense deductions under section 162 for the advances and payments it made on guaranties of Ronald H.'s and his related companies' debts. VHC argues that it is entitled to a deduction under section 162 because it made the advances and payments on guaranties to protect its own business reputation and access to credit. Respondent contends that VHC has neither substantiated the amounts of its expenses nor established that its expenses were ordinary and necessary.

**[\*72]** Section 162(a) allows deductions for ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. An ordinary expense is one that commonly or frequently occurs in the taxpayer's business, Deputy v. duPont, 308 U.S. 488, 495 (1940), and a necessary expenses is one that is appropriate and helpful in carrying on the taxpayer's business, Welch v. Helvering, 290 U.S. at 113.

A taxpayer must substantiate the expenses underlying each deduction. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs. An entry on a taxpayer's books generally will not suffice to substantiate an expense unless corroborated by other evidence. See, e.g., Olive v. Commissioner, 139 T.C. 19, 32-33 (2012) (finding that general ledgers alone did not suffice to substantiate the taxpayer's cost of goods sold), aff'd, 792 F.3d 1146 (9th Cir. 2015). Petitioner argues that its spreadsheet, books and records, and self-prepared summaries are sufficient to substantiate the amounts of expenses. We disagree.

VHC's records are riddled with inconsistencies. Its spreadsheet is inconsistent with documentary evidence supporting the entries. It did not introduce evidence of receipts, bank statements, contracts for services rendered, or documents establishing funds paid on guaranties. It contends that its C.P.A. attested to the reliability of its books and records, but its C.P.A. did not audit those

[*73] books and records. Its C.P.A. did not reconcile the general ledgers with the underlying source documentation to determine their accuracy. It has failed to substantiate the amounts of expenses, including payments on guaranties of Ronald H.'s and his related companies' debts, underlying its claimed section 162 deductions.

Even if VHC did substantiate some of the advances or payments made on guaranties, it has not established that these expenses were ordinary and necessary. It relies on Lutz v. Commissioner, 282 F.2d 614 (5th Cir. 1960), rev'g and remanding T.C. Memo. 1959-32, to support its contention that the amounts it advanced and, specifically, the amounts it paid on guaranties represented ordinary and necessary expenses because they were made in furtherance of its own business. In Lutz v. Commissioner, 282 F.2d at 620, the court allowed the taxpayer to deduct the expenses at issue because it found that the payments were made to protect the existing goodwill of his individual business and to prevent the loss of earnings that might result from destroying such goodwill.

Unlike the expenses in Lutz, many of the guaranties that VHC entered into harmed it. The advances and guaranty agreements limited its ability to obtain surety bonds, causing it to lose revenue by not being able to bid on public work. The guaranties also affected its lines of credit and other financing ability with

**[\*74]** other banks. Two of its major customers stopped conducting business with it because of Ronald H.'s competing ventures, yet it continued to advance funds and guarantee his debts at banks.

VHC contends that the $11 million advanced to fund the second tissue machine at the OFTI mill should be treated as an ordinary and necessary expense because this amount was lent for its benefit. It argues that it obtained expertise on a new type of machine that it subsequently installed in several other places. The record does not establish that VHC obtained expertise in the machine or that it subsequently installed the machine for other customers. It failed to introduce invoices or work contracts for these subsequent jobs.

VHC further contends that it was forced to guarantee Ronald H.'s and his related companies' debts at banks in order to preserve its own lines of credit. It specifically argues that Associated Bank forced it to guarantee Ronald H.'s debts in 2002 in order to extend its lines of credit. While we acknowledge that VHC was concerned about its lines of credit, it had entered into substantial guaranties with Associated Bank before 2002, and it provided guaranties at numerous other banks without providing explanations for entering into those guaranties. It did not show the advances were necessary to protect its business. The motive for the

[*75] advances seemed to be more about helping Ronald H. than protecting its business. Therefore, the advances are not deductible under section 162.

B. Equitable Recoupment

VHC contends that if its advances are not considered bona fide loans and are payments of ordinary and necessary business expenses, then under a theory of equitable recoupment it is entitled to recoup taxes paid on the interest accrued on the amounts it advanced to Ronald H. and his related companies from 1999 through 2003. Because we determined that VHC's advances and payments on guaranties did not constitute ordinary and necessary expenses under section 162, we need not address this argument.

VHC also contends that under a theory of equitable recoupment it is entitled to recoup taxes paid for closed tax years related to the following: (1) interest and services income accrued, but not received, from Ronald H. and his related companies, because these amounts should have been excluded from income and (2) to the extent that we determine that the advances represented equity investments, interest and services income accrued and received during the tax years, because such amounts would constitute nontaxable returns of capital.

Additionally, VHC has failed to establish that the application of equitable recoupment is appropriate. Pursuant to section 6214(b), this Court has jurisdiction

**[*76]** to apply the doctrine of equitable recoupment in appropriate cases. The doctrine of equitable recoupment is a judicially created doctrine that, under certain circumstances, allows a litigant to avoid the bar of an expired statutorily limited period. Menard, Inc. v. Commissioner, 130 T.C. 54, 62 (2008). The doctrine prevents an inequitable windfall to a taxpayer or to the Government that would otherwise result from the inconsistent tax treatment of a single transaction, item, or event affecting the same taxpayer or a sufficiently related taxpayer. Id.; see also Estate of Mueller v. Commissioner, 101 T.C. 551, 552 (1993). Equitable recoupment operates as a defense that may be asserted by a taxpayer to reduce the Commissioner's timely claim of a deficiency, or by the Commissioner to reduce the taxpayer's timely claim for a refund. O'Brien v. United States, 766 F.2d 1038, 1049 (7th Cir. 1985); Menard, Inc. v. Commissioner, 130 T.C. at 62.

Generally, the party claiming the benefit of an equitable recoupment defense must establish that it applies. Menard, Inc. v. Commissioner, 130 T.C. at 62; Estate of Mueller v. Commissioner, 101 T.C. at 556. In order to establish that equitable recoupment applies, a party must prove the following elements: (1) the overpayment or deficiency for which recoupment is sought by way of offset is barred by an expired period of limitation; (2) the time-barred overpayment or deficiency arose out of the same transaction, item, or taxable event as the

**[\*77]** overpayment or deficiency before the Court; (3) the transaction, item, or

taxable event has been inconsistently subjected to two taxes; and (4) if the

transaction, item, or taxable event involves two or more taxpayers, there is

sufficient identity of interest between the taxpayers subject to the two taxes that

the taxpayers should be treated as one.  Menard, Inc. v. Commissioner, 130 T.C. at

62-63.

VHC has failed to establish that it has been inconsistently subjected to two

taxes.  The doctrine of equitable recoupment is generally applied in the limited

circumstances where a transaction has been subjected to two taxes on inconsistent

legal theories, and the tax that was mistakenly paid can be recouped against what

was correctly due.  See Rothensies v. Elec. Storage Battery Co., 329 U.S. 296, 300

(1946).  Our determination regarding whether VHC's advances represented bona

fide debt does not automatically establish that taxes it paid for closed tax years

were erroneously applied.  Application of the equitable recoupment doctrine

would require the Court to make further determinations regarding the amount and

character of VHC's purported accrued interest payments from 1997 through 2003.

It is outside the scope of the equitable recoupment doctrine for this Court to make

such determinations for taxes collected 20 years ago.  VHC is not entitled to

[*78] recoup taxes paid for closed tax years related to interest and services income accrued but not received from Ronald H. or his related companies.

C.     Accrued Interest

VHC argues alternatively that to the extent we determine that amounts owed by Ronald H. and his related companies do not constitute bona fide debt, it is entitled to reduce income accrued for interest reported on its returns.  It also argues that it is entitled to reduce income for tax years 2005-07 and 2009-13 by the amount of interest accrued but unpaid from Ronald H. and his related companies.  VHC accrued interest until 2007 when it determined the probability of payment was not sufficient to warrant accrual.

An accrual method taxpayer includes an item of gain, profit, or income in its gross income for the taxable year in which (1) all events have occurred that fix its right to receive income and (2) the amount can be determined with reasonable accuracy.  Secs. 1.451-1(a), 1.446-1(c)(1)(ii), Income Tax Regs.  Because VHC is an accrual method taxpayer, it included in income interest accrued on advances made to Ronald H. and his related companies.  Interest must be accrued until there is a reasonable doubt as to the collectability of the notes.  Jones Lumber Co v. Commissioner, 404 F.2d 764, 766 (6th Cir. 1968), aff'g. T.C. Memo. 1967-81.  Since VHC accrued interest on the notes only until 2007, only income for tax

**[\*79]** years 2005-07 should be reduced by amounts accrued as interest for advances made to Ronald H. and his related companies. VHC has not substantiated any amount of interest accrued but unpaid for tax years 2009-13.

IV.    Jedson Dispute

VHC accrued income related to invoices it issued to Jedson of $203,036 and $889,453 for 2006 and 2007, respectively. For tax year 2007 it claimed a bad debt deduction of $1,092,489, which respondent disallowed in full. VHC's position is that it should not have accrued income related to the Jedson invoices and that its gross income should be reduced by $203,036 and $889,453 for tax years 2006 and 2007, respectively. In the alternative it contends that it is entitled to a bad debt deduction for these amounts on its 2007 tax return.

A.    Accrual of Income

Generally, a taxpayer is required to include gains, profits, and income in gross income for the taxable year in which he or she actually or constructively received them unless they are otherwise includible for a different year in accordance with the taxpayer's method of accounting. Sec. 451(a); sec. 1.451-1(a), Income Tax Regs. An accrual method taxpayer includes an item of gain, profit, or income in its gross income for the taxable year in which (1) all events have occurred that fix its right to receive income and (2) the amount can be

[*80] determined with reasonable accuracy.  Secs. 1.451-1(a), 1.446-1(c)(1)(ii), Income Tax Regs.  All events have occurred that fix the taxpayer's right to receive income when (1) the required performance takes place, (2) the payment is due, or (3) the payment is made, whichever comes first.  Johnson v. Commissioner, 108 T.C. 448, 459 (1997), aff'd in part, rev'd in part on other grounds, 184 F.3d 786 (8th Cir. 1999).

VHC contends that it should not have accrued the Jedson-related income because the "all events" test was not met in either 2006 or 2007.  It argues that the "all events" test was not satisfied because Jedson initiated a lawsuit against SCS in 2007 disputing the invoiced amounts.  Respondent contends that SCS' performance of the work, for which it back-charged Jedson, and the invoices issued to Jedson representing that payment for the work was due satisfied the "all events" test, and that VHC therefore properly accrued income in 2006 and 2007.

The "all events" test is based on the existence or nonexistence of legal rights or obligations at the close of a particular accounting period.  Hallmark Cards, Inc. v. Commissioner, 90 T.C. 26, 34 (1988).  In the case of a contested claim, accrual is not proper until the dispute is resolved.  Cold Metal Process Co. v. Commissioner, 17 T.C. 916, 932 (1951), aff'd per order, 53-1 USTC para. 9135 (6th Cir. 1952).  A dispute is resolved when the parties settle or when the liability

[*81] is finally determined and is not subject to further appeal or contest. Snyder Air Prods., Inc. v. Commissioner, 71 T.C. 709, 716-717 (1979).

VHC properly accrued as income the $203,036 on the invoice it issued to Jedson in 2006. SCS performed the work that was the subject of the invoice, and it issued the invoice to Jedson for the amount due, satisfying the "all events" test. Jedson did not contest the amount in 2006, fixing VHC's right to the income.

VHC did not properly accrue as income the $889,453 on the invoice it issued in 2007. On September 5, 2007, SCS issued a second back-charge invoice to Jedson related to the work it performed. Jedson did not pay the invoiced amount and initiated a lawsuit against petitioner in 2007. Disputed claims are inherently contingent as to both the fact and the amount of the liability. See Shea Co. v. Commissioner, 53 T.C. 135, 154 (1969). VHC and Jedson did not settle the lawsuit until 2011. VHC improperly accrued $889,453 as income for 2007 and is entitled to reduce its income by this amount.

B.     Bad Debt Deduction

Because we conclude that VHC properly accrued income of $203,036 for 2006, we must consider its position that it is entitled to a bad debt deduction for 2007 for the income it accrued for 2006. In order to be eligible for a bad debt deduction for a debt that became worthless, it must prove that a bona fide debt

[*82] existed and that the debt became worthless in the year for which it claimed the deduction.[5]  Sec. 166(a); sec. 1.166-1(c), Income Tax Regs.  VHC contends that it is entitled to a deduction for a wholly worthless bad debt of $203,036 for tax year 2007, because in 2007 it became clear that the invoiced amount was not going to be paid.

The year a debt becomes worthless is fixed by identifiable events that form the basis of reasonable grounds for abandoning any hope of recovery.  Aston v. Commissioner, 109 T.C. 400, 415 (1997).  The question of whether a debt actually becomes worthless during a taxable year is to be determined on the basis of all the facts and circumstances.  See, e.g., Halliburton Co. v. Commissioner, 93 T.C. 758, 774 (1989), aff'd, 946 F.2d 395 (5th Cir. 1991).  Among the facts and circumstances considered by courts to determine whether a debt is worthless are the debtor's earning capacity, the solvency of the debtor, the debtor's refusal to pay, actions of the creditor in pursuing collection, subsequent dealing between the creditor and debtor, and the debtor's lack of assets.  Am. Offshore, Inc. v. Commissioner, 97 T.C. at 594.  No single factor is conclusive.  Id. at 595.

---

[5]We do not address whether the debt is bona fide because the debt did not become worthless for the year for which the deduction was claimed.

[*83] VHC did not establish that the invoiced amounts became wholly worthless in 2007. It did not introduce evidence regarding Jedson's earning capacity, solvency, or lack of assets. It has not shown that the lawsuit Jedson initiated in 2007 formed a basis for abandoning any hope of recovery. The lawsuit was not settled in 2007, and only after Jedson initiated its lawsuit against VHC did it seek collection of the $203,036. In 2008 SCS filed a counterclaim lawsuit against Jedson to recover its invoiced amounts for 2006 and 2007 and further alleged several contract violations against Jedson. It was not until 2011, when SCS and Jedson settled the lawsuit, that it became clear that the invoiced amounts would not be paid. The settlement required SCS to pay Jedson $280,000 in exchange for the release of its lawsuit against Jedson and Jedson's release of its lawsuit against SCS.

VHC contends alternatively that the settlement of the lawsuit in 2011 entitles it to a bad debt deduction for tax year 2011. VHC raises this contention for the first time on brief. Respondent argues that this alternative 2011 argument is untimely.

On December 1, 2015, the Court ordered that each party submit an Issues Memorandum setting forth the following:

**[*84]**        (1)(a) The issues of fact (including any issues subsidiary to ultimate issues) and (b) the issues of law (including any issues subsidiary to ultimate issues) to be resolved by the Court. * * *;

        (2) A clear, complete, and concise exposition of each party's position and the theory underlying that position with respect to each of the issues that are set forth pursuant to (1) above. * * *

                *    *    *    *    *    *    *

        * * * neither party will be allowed to advance a position or theory underlying that position with respect to any of the issues set forth pursuant to (1) above that is different from the positions or theories set forth pursuant to (2) above.

VHC's argument that it is entitled to a bad debt deduction for the Jedson invoiced amounts in 2011 is untimely.  It is not entitled to a bad debt deduction for 2007 or 2011 for the Jedson income it properly accrued in 2006.

V.    Interest Expense

In 1997 VHC agreed to purchase Raymond and Patricia's 36 apartment units in Green Bay for $750,000, and on December 1, 1997, the parties executed a promissory note.  In that note VHC promised to pay Raymond and Patricia the principal sum, with 10% interest on the unpaid balance from the date of the note until paid.  In 2012 VHC repaid the principal amount of $750,000.

[*85] VHC claimed interest expense deductions of $75,000 for each tax year from 2009 to 2012 and $69,000 for tax year 2013 related to VHC's purchase of the apartment units. Respondent disallowed these deductions in full.

VHC contends that it is entitled to interest expense deductions for tax years 2009-13 because it paid interest on a bona fide debt. Respondent contends that it is not entitled to the deductions because it did not establish that it paid interest on a bona fide debt.

Section 163(a) allows a deduction for all interest paid or accrued within the taxable year on indebtedness. Deductions are a matter of legislative grace, and taxpayers bear the burden of establishing entitlement to any claimed deduction, including substantiating the amounts of items underlying claimed deductions. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. at 84; sec. 1.6001-1(a), Income Tax Regs.

VHC contends that it has met the factors in Goldstein v. Commissioner, T.C. Memo. 1980-273, for a bona fide debt. Intrafamily transactions, as in this case, are subject to rigid scrutiny. See Estate of Van Anda v. Commissioner, 12 T.C. at 1162.

VHC has not met factors that determine a payment is a bona fide loan. See Dixie Dairies Corp. v. Commissioner, 74 T.C. at 493; see also Am. Offshore, Inc.

**[*86]** v. Commissioner, 97 T.C. at 602-606; Goldstein v. Commissioner, T.C. Memo. 1980-273. VHC introduced the promissory note evidencing its purchase, but formal documentation is not controlling. See Calumet Indus., Inc. v. Commissioner, 95 T.C. at 288. Raymond was an influential presence at VHC in 1997 and subsequent years, and he actively participated in its management. Raymond and VHC were free to document the transaction in any manner they chose, and therefore its form has little probative value. See Shaw v. Commissioner, T.C. Memo. 2013-170, at *13. The promissory note required interest and there was a fixed schedule of repayment, but the parties did not comply with the terms of the note.

There is no evidence in the record establishing that any security or collateral was requested. Raymond and Patricia held no security interest and had no way to enforce repayment. There was no right to enforce the payment of principal, as principal payments were not allowed until the promissory note's date of maturity. VHC failed to make principal payments on the promissory note's date of maturity and was allowed to renew the note on the same terms for 15 years. There was no written loan agreement independent of the promissory note, and VHC did not introduce evidence that Raymond or Patricia made a demand for repayment. VHC did not introduce its records or Raymond's and Patricia's records establishing that

**[\*87]** the parties treated the transaction as a loan. VHC has not established that it paid interest from 2009-13 on a bona fide debt. Respondent's disallowance of these deductions is sustained.

To reflect the foregoing,

<u>Decisions will be entered under</u>

<u>Rule 155</u>.